H.L. (Sonny) BROWN, Jr., Petitioner,

v.

**REPUBLICBANK FIRST NATIONAL MIDLAND, Midland, Texas, Respondent.**

No. C–7159.

Supreme Court of Texas.

June 22, 1988.

Rehearing Denied April 5, 1989.

Harrell Feldt and Penelope E. Nicholson, Vinson & Elkins, Houston, for petitioner.

Bobby L. Sanders and Jerry R. Prothro, Boyd, Sanders, Wade, Cropper & Prothro, Midland, for respondent.

WALLACE, Justice.

This is a suit on a lease of commercial office space. H.L. (Sonny) Brown, Jr., sub-leased office space from First National Bank of Midland, Texas. Following the failure of First National Bank, the Federal Deposit Insurance Corporation took over its assets and then sold those assets to RepublicBank First National Bank, Midland. Brown sent RepublicBank a notice that he was terminating the lease but RepublicBank refused to assent to the termination. Brown ceased making rental payments and RepublicBank sued. The trial court, sitting without a jury, rendered judgment for RepublicBank. The court of appeals, in an unpublished opinion, affirmed the judgment of the trial court. We reverse the judgment of the court of appeals and render judgment for Brown.

Across the street from the First National was the Brown Building, occupied by Sonny Brown. The building was owned by a trust which Brown established for his children. First National planned to build an office tower and needed the property occupied by the Brown Building. They worked out an agreement whereby Brown would move to the Paragon Building, a new high-rise office building in which First National had leased approximately 80,000 square feet, of which Brown was to sublease approximately 7,000 square feet.

First National and Brown executed two contracts. The first contract, referred to as the Termination Agreement, provided for Brown's termination of his lease of the Brown Building effective when the Bank acquired title to that building from the Brown Children's Trust. A stated intent of the Termination Agreement was to provide Brown with interim rental space from the time the Bank acquired title to the Brown Building until such time as Brown could occupy adequate permanent office space. The agreement further provided that Brown was to: (1) be paid $100,000 moving and relocation expenses; (2) receive free rent for 18 months; (3) pay only a prorated share of the Bank's obligation to the building owner as rent for any additional time he might occupy the Paragon Building space; and (4) have the "... right to terminate such lease at any time upon thirty days' written notice to the Bank."

The second contract, the Sublease: (1) described the space to be occupied by Brown in the Paragon Building; (2) provided for 18 months free rent; and (3) provided that Brown should pay only a prorated share of the Bank's rental for any time he continued to occupy the space subsequent to the 18 month free rental period.

The issues presented are whether Brown's rights to terminate the lease upon 30 days written notice was impliedly included in the Sublease and *if not,* whether there was a duty on the part of the Bank to mitigate its damages upon Brown's ineffective attempt to terminate the lease. Both parties agree that both the Termination Agreement and the Sublease are unambiguous. Interpretation of agreements which are not ambiguous involves questions of law rather than fact. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968). Brown contends that the Sublease did not revoke the Termination Agreement but that the Termination Agreement continued to be operative after execution of the Sublease. He reasons that where two or more instruments pertain to the same transaction they should be read together even though they might not expressly refer to each other and were not executed at the same time. He finds support for this contention in *Board of Insurance Commissioners v. Great Southern Life Insurance Co.,* 150 Tex. 258, 239 S.W.2d 803 (1951). RepublicBank contends that under Texas law it is not mandatory that where several instruments pertain to the same transaction, they must be read together irrespective of whether they refer to one another, or are executed at the same time. When construing contracts, the intention of the parties is the determining factor. *Guadalupe–Blanco River Authority v. Tuttle,* 171 S.W.2d 520 (Tex.Civ.App.—San Antonio 1943, writ ref'd w.o.m.). We agree with the trial court that the two contracts are not in conflict.

The intent of the parties is evidenced in the Termination Agreement setting forth the contemplation of both parties that Brown would lease the Paragon Building on a temporary basis. Brown's uncontradicted testimony was that the $100,000 moving and relocation expense paid by the Bank was to cover two moves; one from the Brown Building to the Paragon Building, and the other from the Paragon Building to a permanent location. The Termination Agreement specifically referred to a lease of space in the Paragon Building by Brown, which was accomplished through the Sublease. The Termination Agreement anticipated and provided for an extension of the Sublease until such time as the Bank should complete the planned tower on the site of the Brown Building or until termination of the Bank's five year lease of the Paragon Building, provided that Brown leased space in the planned tower.

In view of the above, we conclude that the parties intended for the two contracts to be read together and that Brown's right of termination upon 30 days' written notice applied to the Sublease and was a part thereof. Having so held, we need not address the issue of whether the Bank was under a duty to mitigate its damages.

The judgment of the courts below are reversed and judgment is rendered that RepublicBank First National Midland take nothing against H.L. (Sonny) Brown, Jr.

KILGARLIN, J., concurs and SPEARS, GONZALEZ and MAUZY, JJ., join.

PHILLIPS, C.J., dissents.

KILGARLIN, Justice, concurring.

I concur in the court's opinion, but write to express my agreement with Brown's alternative contention that this court should, as a matter of public policy, create an implied condition which obligates landlords to make reasonable efforts to mitigate their damages following a tenant's default.

I acknowledge there is pronounced disagreement among the states regarding this issue. Some jurisdictions require landlords to mitigate their damages; others do not. *See* Annot., 21 A.L.R.3d 534 (1968). This difference of opinion springs from the dual nature of a lease as both a contract and a conveyance of an interest in land.

The traditional view emphasizes the property law aspect of a lease and imposes no obligation on the landlord to minimize damages. Under this theory, the landlord is not obligated to take any action, but may let the property remain vacant, following the tenant's abandonment, and recover rent periodically during the remainder of the term. This view comports with the law of property and its presumption that the tenant is the owner of the property during the term of the lease. No duty arises because the landlord need not concern himself with the tenant's abandonment of his own property. *See, e.g., Gruman v. Investors Diversified Services,* 247 Minn. 502, 78 N.W. 2d 377 (1956).

A contrary view emphasizes the contractual nature of the lease and incorporates the principle of mitigation of damages which is generally applicable to contract actions. This theory recognizes that modern leases, unlike their feudal antecedents, are primarily compacts of mutual covenants in which the landlord and tenant incur continuing obligations during the term of the lease. This view observes that a landlord's duties no longer end with the execution of the lease and relinquishment of the property and that the property aspects of the transaction are now subservient to the mutual promises made by landlord and tenant. This theory further recognizes a public policy element that requires property be put to beneficial use. *See Wright v. Baumann,* 239 Or. 410, 398 P.2d 119 (1965).

The courts of this state have adhered to the traditional rule of imposing no duty to mitigate. *Early v. Isaacson,* 31 S.W.2d 515, 517 (Tex.Civ.App.—Amarillo 1930, writ ref'd); *Metroplex Glass Center, Inc. v. Vantage Properties, Inc.,* 646 S.W.2d 263, 265 (Tex.App.—Dallas 1983, writ ref'd n.r. e.); *Racke v. Anheuser-Busch Brewing Assoc.,* 17 Tex.Civ.App. 167, 42 S.W. 774, 775 (Galveston 1897, no writ).

An exception to the traditional rule, however, has been recognized when a landlord pursues a remedy in contract. In *Employment Advisors, Inc. v. Sparks,* 364 S.W.2d 478 (Tex.Civ.App.—Waco), *writ ref'd n.r.e.*

*per curiam,* 368 S.W.2d 199 (Tex.1963), the landlord sued the tenant, who had abandoned the premises, for future rentals under a contract theory premised on anticipatory repudiation of the lease. In commenting on the measure of damages for the anticipatory breach of a lease, the court of appeals noted that such damages were "subject, of course, to the usual rules concerning mitigation." *Id.* at 480. We expressed no opinion on this matter in the *per curiam* opinion. Had we done so, we would have explained that the remedy sought by the landlord was exclusively in contract and incompatible with the traditional view grounded in the law of property; hence, the contractual principle of mitigation was applicable. *See* Hicks, *The Contractual Nature of Real Property Leases,* 24 Baylor L.Rev. 441, 521 (1972).

Although the rights of landlord and tenant under Texas law were once firmly rooted in the law of property, this court has gradually come to the realization that contract principles are equally important. We have previously noted that at common law the lease developed in the field of real property law, but that blind adherence to the law of property to determine the duties and obligations of the parties ignored the contemporary realities of the landlord/tenant relationship. Increasingly, we have replaced antiquated property law concepts with more equitable and contemporary solutions in contract. *Davidow v. Inwood North Professional Group—Phase I,* 747 S.W.2d 373 (Tex.1988); *Kamarath v. Bennett,* 568 S.W.2d 658 (Tex.1978); *Humber v. Morton,* 426 S.W.2d 554 (Tex.1968).

Brown, the tenant in our present case, forcefully argues that the time has come for this court to abandon the traditional view that a landlord has no duty to mitigate its damages. Brown submits that it is more sensible to impose the rule of contract which requires an injured party to exercise reasonable care to minimize its damages. *Walker v. Salt Flat Water Co.,* 128 Tex. 140, 96 S.W.2d 231, 232 (1936). I agree. Likewise, so do the following authorities: *Dushoff v. Phoenix Co.,* 22 Ariz. App. 445, 528 P.2d 637, 640 (1974); *Schneiker v. Gordon,* 732 P.2d 603, 610–

611 (Colo.1987) (en banc); *Olsen v. Country Club Sports, Inc.,* 110 Idaho 789, 718 P.2d 1227, 1232–33, 1233 n. 3 (App.1985); *Sigsbee v. Swathwood,* 419 N.E.2d 789, 799 (Ind.App.1981); *Rauch v. Circle Theatre,* 176 Ind.App. 130, 374 N.E.2d 546, 550 n. 1 (1978); *Hirsch v. Merchants National Bank & Trust Co.,* 166 Ind.App. 497, 336 N.E.2d 833, 836 (1975); *Vawter v. McKissick,* 159 N.W.2d 538, 541 (Iowa 1968); *Benson v. Iowa Bake–Rite Co.,* 207 Iowa 410, 221 N.W. 464, 467 (1928); *Lawson v. Callaway,* 131 Kan. 789, 293 P. 503, 504 (1930); *Wichita Properties v. Lanterman,* 6 Kan.App.2d 656, 633 P.2d 1154, 1157–58 (1981); *Jefferson Development Co. v. Heritage Cleaners,* 109 Mich.App. 606, 311 N.W.2d 426, 428 (1981); *Bernstein v. Seglin,* 184 Neb. 673, 171 N.W.2d 247, 250 (1969); *Carisi v. Wax,* 192 N.J.Super. 536, 471 A.2d 439, 442–43 (1983); *Paragon Industries, Inc. v. Williams,* 122 Misc.2d 628, 473 N.Y.S.2d 92, 93, (1983); *Weinstein v. Griffin,* 241 N.C. 161, 84 S.E.2d 549, 552 (1954); *Isbey v. Crews,* 55 N.C.App. 47, 284 S.E.2d 534, 537 (1981); *Ruud v. Larson,* 392 N.W.2d 62, 63 (N.D.1986); *Stern v. Taft,* 49 Ohio App.2d 405, 361 N.E.2d 279, 281 (1976); *United States National Bank v. Homeland, Inc.,* 291 Or. 374, 631 P.2d 761, 765 (1981); *United States Rubber Co. v. White Tire Co.,* 231 S.C. 84, 97 S.E.2d 403, 409 (1956); *Martin v. Siegley,* 123 Wash. 683, 212 P. 1057, 1058–59 (1923); *St. Regis Apartment Corp. v. Sweitzer,* 32 Wis.2d 426, 145 N.W.2d 711, 715 (1966).

The traditional rule that a landlord has no duty to attempt to mitigate is an anachronism that is counterproductive to sound public policy. An injured party, regardless of his relationship to real property, should not be permitted to exacerbate his damages. It has been observed that a covenant to pay rent in a typical contemporary lease is essentially no different than a promise to pay contained in any other contract. *Schneiker v. Gordon,* 732 P.2d 603, 610 (Colo.1987) (en banc). It is simply good public policy "to discourage even persons against whom wrongs have been committed from passively suffering economic loss which could be averted by reasonable efforts." *Wright v. Baumann,* 398 P.2d at

121, *quoting* C. McCormick, *Handbook on the Law of Damages,* § 33 at 127 (1935). Continued adherence to the traditional rule contravenes this sound public policy in that it encourages economic and physical waste. Most recently the Supreme Court of Colorado has recognized this and joined the modern trend away from the traditional rule of no duty to mitigate, writing:

> Under traditional property law principles a landlord could allow the property to remain unoccupied while still holding the abandoning tenant liable for rent. This encourages both economic and physical waste. In no other context of which we are aware is an injured party permitted to sit by idly and suffer avoidable economic loss and thereafter to visit the full economic consequences upon the party whose breach initiated the chain of events causing the loss.... We believe that the contract principle of 'avoidable consequences' or 'duty to mitigate' should be applied in this context to prevent a landlord from passively suffering preventable economic loss, to encourage the productive use of land, and to decrease the likelihood of physical damage to property. Likewise, a landlord should be permitted to maintain an action for contract damages caused by a tenant's wrongful abandonment so that the landlord is able to receive the benefit of his bargain.

*Schneiker v. Gordon,* 732 P.2d at 610–11.

I would add Texas to the list of enlightened states which have abandoned the antiquated rule of property law in favor of more contemporary contract principles. I would hold the landlord to a duty to make reasonable efforts to mitigate his damages and would not permit the landlord to recover avoidable damages, i.e., the increased damages caused by his failure to mitigate.

SPEARS, GONZALEZ and MAUZY, JJ., join in this concurring opinion.

PHILLIPS, Chief Justice, dissenting.

I respectfully dissent. I am willing to concede that the termination agreement and sublease are unambiguous, compatible documents, although their compatibility is

not without question. Further, I am willing to read the documents together. Even so, I do not believe that Brown had any right to terminate his lease with the bank beyond the right provided to him in the termination agreement.

In the termination agreement, executed March 31, 1982, the bank agreed to lease Brown office space in the Paragon Building for eighteen months rent free. Paragraph 5 of this agreement granted Brown an option to extend his lease for six months and terminate it with 30 days written notice. Paragraph 5 provides as follows:

Brown shall additionally have the right and option to be exercised at any time prior to the end of the 18-month rent-free period, to extend his lease in the Paragon Building space (including parking spaces) above described, for an additional period of six months at a monthly rental equal to the actual cost paid by the Bank for 7,012 square feet in said building with Brown having the right to terminate such lease at any time upon thirty days' written notice to the Bank.

Before Brown actually moved in to the Paragon Building, the parties executed a sublease, dated May 30, 1982, in which the bank assigned a part of its lease of the Paragon Building to Brown. The bank's lease of the Paragon Building was for a term of five years, ending on February 21, 1987. Brown's sublease commenced on June 4, 1982. Paragraph 2 of the sublease recited the extent of Brown's assumption of the bank's lease:

2. Assignee (Brown) desires to sublease 7,012 square feet of the Assignor's (Bank's) space located on the fifth floor of said building ... and to assume all rights, liabilities and duties of assignor in the leased space *except for the payment of rent for the first eighteen month period of the sublease beginning June 4, 1982.* (Emphasis in original.)

There was no termination clause in either the base lease or the sublease.

It seems readily apparent to me that further negotiations after the execution of the termination agreement resulted in a new agreement regarding the length of time Brown could occupy the Paragon Building at the bank's cost. Instead of a six month option to extend the initial rent free period, Brown assumed a part of the bank's leasehold, at the bank's cost, for the duration of the bank's base lease. Under the new agreement, however, there was no mention of either the option to extend or the right to terminate contained in Paragraph 5 of the termination agreement.

In its findings of fact, the trial court found as follows:

Prior to entering into the agreement dated May 30, 1982, the Defendant had counsel of his own selection review the terms of the Agreement and changes suggested by Defendant's counsel were incorporated into the agreement. Defendant was in an equal position with the First National Bank of Midland to negotiate the terms of the sublease agreement.

The Agreement dated May 30, 1982 granted additional rights to the Defendant to occupy and use the Paragon premises beyond the term provided for in the March 31, 1982 agreement and did not grant to the Defendant the right to terminate the sublease upon 30–days written notice as contended by the Defendant. The agreements entered into by the parties are separate and distinct agreements which are not ambiguous and are not in conflict with one another.

These findings are consistent with the plain language of the two agreements.

I therefore agree with the lower courts that Brown's right to terminate the lease expired at the end of the twenty-four month term agreed to by the bank in the termination agreement. Whether or not the termination agreement and sublease are read together, I see no justification for extending termination rights beyond that period agreed to by the parties. As the court of appeals observed, reading contracts together does not justify bodily taking a paragraph from one contract and transplanting it into another.

Although I disagree with this court's construction of the two contracts, I do agree with Brown's alternative argument

that as a matter of public policy this court should create an implied condition obligating a landlord to make reasonable efforts to mitigate its damages following a tenant's default. The authorities cited in Justice Kilgarlin's concurring opinion support such a change in our common law.

Because this duty to mitigate represents a change in the law, the Bank had no reason at trial to rebut Brown's evidence regarding mitigation. I would therefore reverse the judgment of the court of appeals and, in the interest of justice, remand the cause to the trial court for new trial. *Morrow v. Shotwell*, 477 S.W.2d 538, 541–42 (Tex.1972); Tex.R.App.P. 180; Calvert, *"… In the Interest of Justice"*, 4 St. Mary's L.J. 291, 299–300 (1972).